Sneed, J.,
delivered the opinion of the Court.
This cause involves the grave and important question whether a court of equity has the power to enjoin an incorporated railroad, company from the use and enjoyment of a portion of its road-bed located on the land of the complainant without his consent, and whose title to the fee has never been extinguished by the payment of its assessed value, the just compensation guaranteed to him by the Constitution.
The Chancellor below decreed that the complainant’s debt be paid within ninety days, or in default thereof that defendants be enjoined from the further use and occupation of so much of its road-bed as lies *526 upon the land of the complainant. The defendants to the hill are the Nashville and Northwestern Railroad Company, the Nashville and Chattanooga Railroad Company, and the State of Tennessee. The last two have appealed. The undisputed facts necessary to be considered are that the Nashville and Northwestern Railroad Company was created a body corporate by the Act of 1852, c. 74, for the purpose of establishing a line of railway communication between the city of Nashville and a point on the Mississippi River in the county of Obion. The charter provides that where any lands or rights of way may be required by the company for the purpose of constructing their road, and for want of agreement as to the value thereof, or from any other cause, the same can not be purchased from the owner or owners, the same may be ’ taken at a valuation to be made by five commissioners, or a majority of them, to be appointed by the Circuit Court of the county where some part of the land, or the right of way is situated. After providing for the" manner of assessment, and the right of appeal therefrom to the Circuit Court, and a revaluation thereof by a jury, the charter provides that the lands, or right of way, so valued by the commissioners or jury, shall vest in the company in fee simple as soon as the valuation may he paid, or when tendered may he refused, to the extent of two hundred feet wide, and that where there may be an appeal, as aforesaid, f from the valuation of the commissioners, of either of the parties, the same shall not prevent the work intended to be constructed from proceeding; but when *527 the appeal is by the company requiring the surrender, they shall be at liberty to proceed with their work only on condition of giving the opposite party a bond with good security, to be approved by the clerk of the court where the valuation is returned, in a penalty equal to double the said valuation and interest in case the same be sustained; and in case it be reversed, for the payment of the valuation thereafter to be made by the jury and confirmed by the Court, provided that when land can not be had by gift or purchase, the operations of the work are not to be hindered or delayed during the pendency of any proceeding to assess its value as aforesaid, nor shall any injunction or supersedeas be awarded by any Court or Judge to delay the progress of said work. Act of 1852, c. 74, s. 23. The company thus • incorporated proceeded to the location and construction of its road, much of which, including that portion located on complainant’s land, has been completed, and for several years has been in operation. The land of the complainant was thus appropriated without his consent and without contract, in the year 1860, and, on the 8th of March, 1861, he proceeded, in the manner prescribed by the statute, to have his damages assessed, which were fixed by the commissioners at one thousand dollars:
The case was brought by the company by appeal before the Circuit Court, where there was a verdict and judgment against the company for a like amount. The civil war and the suspension of the courts having intervened, the case was not brought to trial *528 and judgment in the Circuit Court until July, 1867. Upon taking its appeal from the action of the commissioners, the company gave no bond as prescribed by the charter. An execution was issued upon the judgment, and was returned on the 21st of October, 1867 — “No property found.” The complainant is the undisputed owner of the land in question, and has been in possession for more than thirty years. The valuation of the complainant’s land so appropriated, and so assessed, and .now in the possession of the defendants, has never been paid, and the whole is still due to the complainant. The State of Tennessee, by an act of its Legislature, passed the 11th of February, 1852, entitled “An Act to Establish a System of Internal Improvements,” loaned its credit to divers railroad enterprises in the State, and among them to the defendants, by issuing its coupon bonds to an amount not exceeding eight thousand dollars per mile.
These bonds were authorized to be issued to the several companies from time to time as prescribed in the act, as sections thereof might be ready for the iron rails, upon condition of payment by the companies of the semi-annual interest accrued, and the ultimate redemption of the bonds at maturity, and upon the further condition that the bonds, when so issued, should constitute a lien upon the property of the company in said section, including the road-bed, right of way, grading, bridges, and masonry, upon all stock subscribed for in said company, and upon the iron rails, chairs, spikes and equipments, when purchased *529 and delivered; and the State, upon the issuance of said bonds, and by virtue of the same, shall be invested with said lien or mortgage without a deed from the company, for the payment by said company of said bonds, with interest thereon, as the same becomes due; and upon default of any company so accepting the bonds to meet the interest or to discharge the bonds when they fall due, a very summary remedy for the indemnity of the State is prescribed, through the intervention of a receiver, to be appointed by the Governor, to take charge of the road and all its appurtenances, to be operated or so disposed as to save the State harmless. The defendant, under this act, received State aid to the amount of several millions of dollars.
The first issuance of bonds so made to defendant was on the 23rd of November, 1859, and the last on the 29th of July, 1868; and it is provided that when the whole of said road shall be completed the State shall be invested with a lien without a deed from the company, upon the entire road, including the stock, right of way, grading, bridges, masonry, iron rails, spikes, chairs, and the whole superstructure and equipments, and all the property owned by the company as ■ incident to or necessary for its business, and all depots and depot stations, for the payment of all said bonds issued to the company as provided in this act, and for the interest accruing on said bonds. Act 1852, c. 151. By secs. 1122 and 1123 of the Code, it is provided that a railroad company owning any main line. may contract with any other company owning a railroad connecting with such main line for the lease *530 thereof, and that the lessees shall hold such road subject to the liens and liabilities to which it was subject in the hands of the lessor, and be bound for all payments for which the lessor was liable. And under the general statute regulating the assessment of damages for lands appropriated for public uses, it is provided that no person or company shall enter upon such land for the purpose of actually occupying the right of way until the damages assessed by the jury of inquest and the costs have been actually paid; or if an appeal has been taken, until the bond has been given to abide by the final judgment. Code, s. 1346. If, however, such person or company has actually taken possession of such land, occupying it for the purpose of internal improvements, the owner may petition for a jury of inquest, in which case the same proceedings may be had, as near as may be, as here-inbefore provided; or he may sue for damages in the ordinary way, in which case the jury shall lay off the lands by metes and bounds, and assess the damages as upon the trial of an appeal from the returns of a jury of inquest. Code, s. 1347.
On the 30th of September, 1867, the company then being very largely in arrears to the State, on account of said bonds so issued, the road was seized by the State, a receiver appointed, and the road thenceforth operated by the State until the 17th July, 1868, when the Nashville and Chattanooga Railroad Company concluded a negotiation with the State by which the said company leased the defendant’s road upon terms acceptable to the State, and not necessary to be detailed.
*531 Among the stipulations of said lease was one, that the Nashville and Chattanooga Railroad Company was in no event to be liable for any of the debts or liabilities of the Nashville and Northwestern Railroad Company. The former was operating the road of the latter under this lease at the time of the filing of this bill, and hence was made a party defendant. The State became a party defendant upon her own petition, in which her rights- and equities in the cause are fully set forth, the grounds of which are indicated in the facts hereinbefore stated, and will be briefly referred to hereafter.
The answer of the Nashville and Northwestern Railroad Company admits the case as stated in the bill, but insists that the complainant might have secured • himself in the suit at law by requiring a bond of the company upon its appealing, and that at that stage of the case he might also have enjoined until his compensation was paid or secured, and that by his failure to do either, he has lost .the remedy he now seeks, and that as he did not ask the injunction at that time, and until the road wras completed and in operation, it is now too late, as the rights of others have attached. That the courts will not grant an injunction restraining a company from operating its road after it is in full possession and operation, and that an injunction will only be decreed to restrain it from taking possession of land illegally. The answer also recites the lease for the use of the State to the Nashville and Chattanooga Railroad Company, and admits the insolvency of the respondent. The answer of *532 the Nashville and Chattanooga Railroad Company relies upon the same defenses, and insists that it is not operating the road in connection with the Nashville and Northwestern Railroad Company, but in subordination to, and for the benefit of the State, which is its lessor; that it occupies the position of an innocent purchaser, contractor, or lessee for value, without notice, and that it is the mere agent of the State, and not subject to injunction.
The Chancellor permitted the State to rely upon its petition to be made a defendant as an answer. The defense set up by the Stateis predicated upon its statutory mortgage given by the acts already referred to,, and it insists upon the same defenses stated in the answers of its co-defendants, that complainant has lost his remedy by his laches at law, and that the State having a lien superior to all others, that lien and the means of its discharge can not be interfered with or restrained by one of its courts.
Under these complications, the question recurs, is the citizen utterly without remedy where his land has been seized without his consent and appropriated without compensation? The solution of the question must depend mainly upon the equities presented on behalf of the State, and which grow out of her peculiar relation to railroad companies which have received her bounty, and which have failed to discharge the obligations assumed in so doing. ~We do not assent to the proposition that the complainant has lost his remedy because he failed to demand security at law, or be *533 •cause he failed to invoke the injunctive powers of the courts when the defendant’s road was about to be ■built over his land. The statute imposed upon the defendant in appealing the duty of giving bond. The words of the act are that “when the appeal is by the company requiring the surrender, they shall be at liberty to proceed with their work only on condition ■of giving to the opposite party a bond with good security, to be approved by the clerk of the court where the valuation is returned, in a penalty equal to ■double the said valuation and interest, in case the same be sustained; and in case it be reversed, for the payment of the valuation thereafter to be made by the jury and confirmed by the court.” The statute requires that reasonable notice shall be given the opposite party of this appeal. This provision is imperative, and no such notice is shown. . The giving of the bond is made the affirmative' duty of the appellant, and does not depend upon the demand of the appellee. Hence no waiver can be predicated upon his failure to demand it; and even had the bond been demanded and given, it does not follow that the constitutional right of the complainant to a just compensation ' would thereby have been guaranteed. The sureties might have followed the defendant and become insolvent, leaving complainant’s constitutional warrant for compensation still unsatisfied. It was the duty of the defendant to give the bond, but the plaintiff was not bound to look to that bond for the security of his right to compensation. His bond is toritten in the Constitution itself, and so long as his property is *534 unpaid for he remains the victim of oppression and injustice. There was no means of compelling the defendant to give the bond or abandon his land. The proviso to the section emasculates it of its remedial powers. It is, that when the land can not be had by gift or purchase, the operations of the work are not to be hindered or delayed during the pendency of any proceeding to assess its value as aforesaid, nor shall any injunction or supersedeas be awarded by any judge or court to delay the progress of the work. The statute contradicts itself, but the proviso must be taken as conclusive of the legislative will. When the proviso of a statute is directly repugnant to the purview of it, the proviso should stand and be held a repeal of the purview because it speaks the last intention of the law-giver. 1 Kent, 504; Potter’s Dwarris, 118. If the proviso be directly -contrary to the purview, the proviso is good and not the purview. Townsend v. Brown, 4 Zab., 80; Rex v. Justices of Middlesex, 2 B. & Adol., 818. The constitutional provision is imperative, that the land of the complainant shall not be taken without compensation. He has not been paid, and he has been continuously litigating his right to such compensation ever since his property was taken. Under such circumstances, he can not be held to a mere technical waiver, as he had no remedy by which he could regain the land that had been thus appropriated without his consent and against his will.
A' waiver is a relinquishment of or a refusal to accept, a right, t The waiver of one of several remedies, or the waiver of a remedy as against one of several par *535 ties, does not extinguish the right. Thus, it is said, a party in seeking a remedy may waive a part of his right and sue for another part. 1 Chitty Pl., 90. If the plaintiff had received the requisite notice of the intention of the defendant to appeal, and had in express terms waived the bond, believing, as was the fact, that the defendant was then solvent, yet he stands securely on the constitutional guaranty, and unless we could ignore its imperative terms, his right can not be extinguished as against the defendant until compensation is made. Under the express terms of the defendant’s charter the title remains in the plaintiff until the valuation is paid or tendered.
The injunction of the law was upon the defendant to give the bond. It was not left to the mere option of the complainant to demand it, but it was the defendant’s duty at all events to give it. In failing to do so. the defendant was guilty of a palpable violation of the law, and can not be heard to excuse his own wrong by imputing laches to the complainant.
We have then before us the case of a citizen of Tennessee whose property has been taken without compensation by the government, under the indisputable right of eminent domain, and given to an insolvent corporation against which he is utterly without remedy at law. He appeals to a court of equity for relief. He stands upon the great constitutional guaranty that no man’s particular services shall be demanded, or property taken, or applied to the public use, without the consent of his representatives, or without compensation being made therefore. Const. Tenn., art. i, s. 21.
*536 The right of eminent domain is inherent in every government. It is an essential attribute of sovereignty, without which government would be powerless in accomplishing the object of its organization, which is, to promote the general welfare of the people. The question what is a public use for which private property may be taken, is a political question, to be determined by the States. It is universally conceded that a railroad enterprise for the use of the general public as a mea'ns of intercommunication, is a public use within the meaning of the Constitution. The State had an undoubted right to take the complainant’s land, or to authorize it to be taken and appropriated by defendant for the construction of its road. It is unnecessary to say more upon this subject than simply to reiterate these familiar and indisputed propositions.
But the right of eminent domain is fettered by one obstinate condition, and that is, that the property taken must be paid for. This principle of indemnity is one of natural justice, and is of very ancient origin. Thus we are told that in ancient Borne such respect was paid- to the rights of private property that a scheme of the censors to supply the city with water by means of an aqueduct was defeated by the refusal of a proprietor to let it be carried through his lands; and afterwards it was decreed by the Senate that it should be lawful to take materials from the adjoining lands of citizens to repair public aqueducts upon an estimate of the value or damages to be made by good men, and doing at the same *537 time the least possible injury to the owner. "When a private house was injured by a public aqueduct, the Emperor Tiberius paid the damage, on petition to the Senate. 2 Kent, 411. Another instance is given where the Sultan of Turkey being desirious of building and' endowing a new mosque, selected a spot in Constantinople which was the property of several subjects. He treated with all of them for the purchase of their respective interests, and they all agreed except a Jew who owned a small house on the place, and who refused to give it up. A great price was offered, but he obstinately refused to sell. The Sultan consulted his judges, who announced that private property was sacred, and the laws of the Prophet forbade his taking it absolutely, but he might compel the Jew to lease it to him as long as he pleased at a full rent, and the Sultan submitted to the law. 2 Bay 58.
These examples are given as evidence that the principle of indemnification is one of natural justice. But it is the approved opinion that property in this country when taken for public use need not be paid for before being taken. It is enough that provision be made for compensation afterwards, provided the payment be absolutely certain. Smith v. Helmn, 7 Barb., 416; 18 Wend., 667; Anderson v. Turbemlle, 6 Col., 151. The rule is we think well stated by Chancellor Walworth, that the compensation must be either ascertained and paid before the property is appropriated, or an appropriate remedy must be provided, and upon an adequate fund, whereby the owner may obtain his com *538 pensation through the medium of the courts of justice. 18 Wend., 9; and Chancellor Kent held that if the government proceed without taking these steps, their agents and officers may, and ought to be, restrained by injunction. He granted an injunction in such case when acting as Chancellor, and in support of his opinion cited, it is said, “the profoundest writers upon the civil law and the law of nature; and said that this limitation of the power existed before it was incorporated into our own Constitution, that it' was admitted by the soundest authorities,. and adopted by all temperate and civilized governments from a deep and universal sense of justice.” Gardner v. Village of Newberg, 2 Johns. Ch., 162; Potter’s Dwarr., 392.
This learned jurist was of the opinion that in all such cases the compensation, or offer of it, must precede, or be concurrent with, the seizure and entry upon private property taken under the authority of the State. But this Court has held that it may be taken before compensation be actually paid, but only after certain provision has been made for the payment. Anderson v. Turbeville, 6 Col., 160. In that case it was held that a person whose land has been taken for public use, without compensation, has the right to enjoin the taking, and have it declared void, unless compensation is paid or provided. That was a controversy about a street, but the Court expressly reserved the question as to the application of the doctrines of that case to that of railroads and the like, when the property is to be used for a franchise and is granted to such corporation. Ib. 165. The effect *539 of the right of eminent domain, said Johnson, J., in Fletcher v. Peck, amounts to nothing more than the power to oblige the citizen to sell and convey when the public necessities require it. 6 Cranch., 145.
It is not claimed that the defendant has any title to the land in controversy here. The most that can be claimed by the appropriation is an inchoate right that may ripen into a perfect title upon the payment of the price. So it is held • that when the charter of a railway company provides that where the title of land condemned for the use of the company shall vest in the.company upon payment of the amount of valuation, no title vests until such payment, Balt. and Susq. R. Co., v. Nesbitt, 10 How., 395, and it is held that when the railway company enter into the possession of the land and construct their road without having paid the whole of the damages assessed therefor, a court of equity will enforce the payment by an order of such payment within a time named, and in default will restrain the company by injunction from using the land until the price is paid. 1 Redf. Railways, 241. Cozens v. Bangor Rail W. 12 Jur. N. S. 738; Cushman v. Smith, 34 Maine R. 247; 18 Wend. 9; Redfield’s Am. Railway cases, 225, 231, 233, 245. Stacey v. Vermont Central Railway, 27 Verm. R. 39. And so it is said by this Court that “the people, in whom the sovereign power resides in this free country, were not willing to leave this dangerous, though essential, right of eminent domain, a power to deprive a man of his property against his consent, unguarded by barriers of a permanent nature, but inserted in *540 their constitution restrictions upon it. They impliedly delegate the right, but protect the citizen, and secure to him the value of his private property. Woodfolk v. N. and C. R. Co., 2 Swan, 431. We hold the proposition to be incontrovertible that when the property of the citizen is to be taken and appropriated under the right of eminent domain, the statute authorizing it must be strictly followed; and the conditions of indemnification, either made or beyond all peradventure assured, become a precedent condition to the divestiture of the owner’s right. Cooley’s Cons. Lim., 528. So if a statute vests the title to lands appropriated, in the State, or in a corporation, on payment therefor being made, then it is plain that such payment is a condition precedent which must first be complied with, Ib., Stacey v. Vermont Central R. R. Co., 27 Verm., 44. In that case the statute provided that when land was taken by a corporation for the use of their road and the parties were unable to agree upon the price, the same should be ascertained by ■ commissioners, and upon the payment or deposit thereof, the corporation should be deemed seized and possessed of the land, and it was held that until the payment was made, the company had no right to enter upon the land, to construct the road, or to exercise any act of ownership over it, and that a court of equity would enjoin them from exercising any such right.” This case follows Baltimore and Susquehannah R. R. Co., v. Nesbitt, 10 How., 395, and Bloodgood v. Mohawk and Hudson R. R. Co., 18 Wend., 10, where the statutory provisions are similar. Cooley’s Cons. *541 Lim., 529. These citations sufficiently illustrate the uniformity of the rule, as given by Chancellor Kent, that in all such cases the statute that deprives the citizen of his property for a public use, against his consent, must be strictly pursued. The charter of the defendant sanctions the entry and possession before payment, but expressly forbids a divesture of the title until payment is actually made. But when it sanctions the entry and possession before indemnity, it is upon the assumption that there is an absolute guaranty of - ultimate indemnity.
It is stated as settled and fundamental doctrine that government has no right to take private property for public purposes without giving a just compensation, and it seems to be necessarily implied that the indemnity should, in cases which admit of it, be previously and equitably ascertained, and be ready for reception concurrently in point of time with the actual exercise of the right of eminent domain. This point was ably discussed in Thompson v. Grand, Gulf R. Co., 3 How. Miss., 240, and the decision was that compensation must precede the seizure. 2 Kent, 409. Such seems to be the opinion of the learned commentator last cited, but upon this point the authorities are in conflict. Vide 12 Serg. and Rawl., 366; 20 Johns., 745; 6 Wend., 634. We have already seen, however, that in this State the indemnity needs not precede the seizure, provided the statute secure it beyond all contingency. And the best security guaranteed under defendant’s charter is that the title in the fee remains in the owner until the indemnity is paid. *542 And this brings us at once to the question, what remedy remains to the owner in the event of the insolvency of the corporation, or its obstinate refusal to pay the indemnity, after the seizure and appropriation of the land. The virtue of a judgment and execution has already been tested and found unavailing. The title is unquestionably in the complainant, but he could not bring ejectment because he is not entitled to the possession. The law has authorized the defendant to enter and construct its road, and it has done so, and is now operating it, by itself or its assignees. The sanction that the law gives to the entry would alike defeat the action of trespass. Where then is the complainant's remedy? His property has been taken without his consent. His right under the organic law to just compensation has been denied him, and he is absolutely without remedy in a court of law. But there is no wrong without a remedy. If a man has a right, he must, it was said in a celebrated case, have a means to vindicate and maintain it, and a remedy if he is injured in the exercise or enjoyment of it. It is a vain thing to imagine a right without a remedy, for want of right and want of remedy are reciprocal. Ashby v. White, 2 Lord Raym., 953; Winsmore v. Greensbank, Willes, 577; Broom’s Max., 147.
The complainant’s remedy, if anywhere, must ^be found in the injunctive powers of a court of equity. After enumerating many of the instances in which this power will be exercised, a learned author observes: “It would be difficult indeed *543 to enumerate them all, for in the endless variety of cases in which a plaintiff is entitled to equitable relief, if that relief consists in restraining the commission or continuance of acts of the defendant, a court of. equity administers it by means of the writ of injunction.” Eden on Injunc., ch. 1; 1 Maddox Ch. Pr., 106; 2 Story’s Eq. Jur., s. 872. Among the instances cited by the last authority is that when the right of possession and property is being injured, obstructed, or taken away illegally, by a railroad company. 2 Story Eq., s. 926. Bonaparte v. Camden and Amboy Railroad Company, 1 Bald. R., 231. In the latter case, says Judge Story, the principle was strongly exemplified. The bill was brought to prevent the company from illegally appropriating the complainant’s land. ^ On this occasion Mr. Justice Baldwin said: “The injury complained of as impending over his property, its permanent occupation and appropriation to a continuing public use which requires the divesture of his whole right, its transfer to the company' in full property, and its inheritance to be destroyed as effectively as if he had never been its proprietor. * * * * If his rights of property are about to be destroyed without authority of law; or if lawless danger impends over them by persons acting under color of law, when the law gives them no power, or when it is abused, misapplied, exceeded, or not strictly pursued, and the act impending would subject the party committing it to damages in a court of law for a trespass, a court of equity will enjoin its commission.”
*544 In the same case it was held that, although an act of the Legislature appropriating private lands to public uses without compensation first being awarded, was not unconstitutional; yet a court of equity wilj issue an iniunction against the actual possession of the landá until compensation was made. Mohawk and Hudson Railroad Company v. Artcher, 6 Paige R. 83.
If, indeed, concludes Judge Story, courts of equity did not interfere in such cases, there would be a great failure of justice in the country. 2 Story Eq. Jur., s. 928. So it was held in Stewart v. Raymond et al., 7 S. and M., 568: “if a railroad company neglect to pay the owner of land the damages awarded for the right of way, equity will enjoin them from using the land until the damages are paid.” Hill. Inj. 520. And so in the case of Cozens v. Bangor Railr., 12 Jur., N. S., 738, already cited, it was held that where the railway company enters into the possession of the land, and constructs its road without having paid the whole of the damages assessed therefor, a court of equity will enforce the payment within a time named, and in default will restrain the company by injunction from using the land until the price is paid. 1 Redf. Rail., 241; and so in the case of Perks v. Wycombe Railroad Company, 3 Giff., 662, it is held that if a company is in possession under a legal title, the court will not interfere at the suit of a person alleging an adverse title, to restrain the company from continuing in possession, but if land has been taken by a company improperly, or if the conduct of the company has *545 been vexations, unreasonable and oppressive, tbe court may restrain them from continuing in possession until a proper compensation has been made. Kerr’s Injunctions in Eq., 298.
We think we may safely evoke from these authorities an ample warrant for the opinion to which we are brought — that the complainant’s remedy in this character of case has not been mistaken by his bill, if there be no other complications in the cause by which that remedy has been defeated. We have been referred to one or more English cases in conflict with this current of American authorities, but we choose to follow our own, if for no other reason, because the right of the citizen here reposes upon an inviolable guaranty of the organic law, rather than the volatile breath of a mere act of Parliament, or the malleable doctrines of the English 'common law. The case of Deere v. Guest, 13 Eng. Ch. R., 516, was a controversy about a private right of way, am’d for a private use, — for a tram-road connecting a limestone quarry with the Dowlais Iron Works, in which the right of way had actually been given by a tenant in possession.
It rests upon different principles from those governing this case. The Lord Chancellor in that case disposed of the equities of the parties upon the ground that what was claimed by defendants was a mere right of way. If they are not entitled to that right, said he, then they are mere trespassers, -and the plaintiffs have their proper legal remedy. We have seen that no such remedy exists under the right of -eminent *546 domain, that when the statutory remedy fails, the ' in-junctive powers of' a court of equity become the der-nier resort for the enforcement of the right to indemnity. And this brings us to the consideration of the last question presented upon the argument. And here it may be observed, that if the State, as assumed, has suffered a great wrong to be done to one of its citizens, and has connived at that wrong by an improper exercise of its right of eminent domain, and is here to claim a pecuniary benefit from it, then it becomes us to look well to what we are doing, that on .the one hand the State shall suffer no disparagement, and on the other hand the constitutional rights of the citizen shall be rescued and vindicated in a contest so unequal. We have been reminded in argument of certain axioms of the common law of England applicable to kingly power, but which never obtained in the jurisprudence of this country. It is not true that the State can do no wrong, and there can be no shadow of difference in obliquity between the mala jlides of an individual and the púnica fides. of a commonwealth. If such shadow there be, it must fall upon the latter, which in undertaking by stringent laws to enforce fair dealing amongst its citizens, should lift up a standard of morality for the people worthy of a sovereign. The State could not have been forced into this controversy, but having voluntarily entered it, she is entitled to no more consideration than the humblest of her citizens, and must abide by the mandate of her own laws. In becoming a common carrier, or a corporator, or partner in a railway company, the *547 State has sunk the right and dignity of the sovereign to a level with those of the citizen, and in coming to litigate those rights in her courts, her controversy can only be treated as one between man and man. 8 Watts, 316; 9 Wheat. 904; 1 Sneed, 354; 3 Sneed, 381; 3 McCord, 377; 6 Ala. R., 814; 2 Peters, 323.
It is assumed, then, on behalf of the State that she holds a statutory .mortgage upon the road-bed and all the appointments of the defendant which takes precedence of all other demands, and it is contended-that this lien, when acquired by the issuance of the bonds, has priority over all other claims existing, or to exist, against said company, and such is the provision of the statute, which, so. far as it undertakes to - destroy or impair existing contracts, is simply a nullity. But these bonds are to be issued as sections of the road may be ready for the iron rails, and it seems they were so issued in this case. When so issued, they are to constitute a lien and mortgage without deed upon the section for which they are issued, from the moment of issuance; and if to every section the bonds are issued during the progress of the work, then the entire road is burdened with the lien, the mortgage upon each section dating from the issuance of bonds to that section, and among the conditions to their lawful issuance is one, that the said section is not subject to any other lien whatever, and this must be made to appear to the Governor by the affidavits of the chief engineers and the president, together with the affidavit of a special engineer appointed by the Governor himself. Act of 1852, c. 61.
*548 As we have already seen, the first bonds were issued to the defendant upon the first section on the 23d of September, 1859, and the last on the 29th of July, 1868. When were the bonds issued for the section located over the complainant’s land? When was the assumed lien upon this section acquired, if such a thing could be, as a mortgage upon property to which the mortgagor never had a title? Was it before or after the complainant’s litigation and judgment at law? The State has not shown when her supposed lien attached. Did the State go forward incautiously and issue the bonds for the section in question without demanding to know, as the statute required, what other claims or demands were upon it? If not, did she have information that the complainant’s land had been taken without compensation, and that the insolvency of the defendant had thus far baffled all efforts at indemnity? These are pertinent questions, and a court of equity will regard with suspicion the absence of all affirmative proof upon this subject under the extraordinary circumstances of this case.
But the statement of a simple and familiar prin ■ ciple of law dissipates this whole complication as to the overshadowing liens and demands of the State. The defendant could not mortgage what was not its own. The general principle is that nothing is mortgageable unless it be the property of a mortgagor. The mere franchise, perhaps, of the defendants over the complainant’s land was the subject of mortgage, and such a mortgage would pass the defendants’ equity without derogation to complainant’s title in fee, and *549 subject to indemnity therefor. Thus far, and no further, could the State have acquired a lien, and this does not divest the fee.
In the case of the State v. Mexican Gulf Railroad, 3 Rob. Louis. R., 513, it is held that a railway, where the soil upon which it is laid belongs to another, the “owners not having been expropriated,” is not susceptible of being mortgaged unless authorized by the Legislature and that future property can never be the subject of conventional mortgage. And in the case of the Borough of Easton’s Appeal, 47 Penn. St. R., 255, it was held that a mortgage by a corporation of their franchises, property, and effects, given after their entry upon lands, and before judgment for damages, will bind their equitable interest therein, subject to the payment of the judgment for the purchase-money. The defendants then in this case not having a mortgageable interest in the fee, could make none to the State, nor could such a paramount lien have been acquired by the State upon the defendant’s land until his constitutional right to just compensation had been discharged. The case of Pierce v. The Milwaukie & St. Paul Railroad Co., 1 Am. R., 203, to Avhich we have been referred, bears but little analogy to this. In that case there had been a sale, and the contest was between the mortgage and the vendor’s lien. In this there has been a violation of the constitutional rights of the citize'n whose property has been taken without his consent. He has no technical lien upon the property itself, but he stands upon his constitutional right to indemnity, which can only be discharged in the manner required *550 by the organic law — the payment of “just compensation.”
We hold in this case that the State has never acquired such a lien upon complainant’s land as to divest or defeat his right to the just compensation secured to him by the organic law. The right of eminent domain, lawfully exercised, is entirely compatible with fair and honorable dealing .in the sovereign. It gives no sanction to an act of robbery under the forms of law.
The principles of this opinion have already indicated in the main the equities of the other defendants in this cause. It has been suggested that the Nashville & Chattanooga R. R. Co., pending this litigation, has become the purchaser of the Nashville & Northwestern Railroad. If this be true 'this changed relation can in nowise change or affect the liabilities of the parties, as the pendency of this cause fixes upon the said company a full and accurate notice of this litigation and all the equities of complainant in the cause. The defense of innocent purchaser, or contractor, or essee, as relied upon in the defendant’s answer, can avail nothing. There can be no innocent purchaser from one who was not seized of the title. Craig v. Leeper, 2 Yerg., 193.
We have given to this important cause that degree of consideration, investigation, and thought, which its magnitude demands, and we are brought to the conclusion that the equities of the cause are with the complainant.
We have been admonished at the bar that the ef- *551 feet of the confirmation of the Chancellor’s decree in this cause will be to stop the United State mails, to check the impulse of industrial progress, to cut in twain an important line of trade and travel, and to bring upon the public, and especially on this commonwealth, trouble, inconvenience, and misfortune. These are considerations which in a case like this should not be pressed upon a tribunal of justice. There is neither magic nor terror in public policy when it obstructs the path of constitutional right.
A decree will be entered here against the Nashville & Northwestern Railroad Company for the complainant’s debt, interest, and costs, to be paid into the office of the* Clerk of this Court in ninety days from the final adjournment of the present term of this Court; and in default thereof, the defendants to this bill, and all other persons, parties, and corporations, will be enjoined and forbidden from the use, occupation, and operation, of so much of said Nashville & Northwestern Railroad as is located over the lands of the complainant, until his said “compensation” be paid.